# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:05cv343

| | | |
|---|---|---|
| YVONNE PRESTON; and TOM PRESTON, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| McDOWELL COUNTY; McDOWELL | ) | |
| COUNTY d/b/a McDOWELL COUNTY | ) | |
| DEPARTMENT OF SOCIAL SERVICES, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on defendants' Motion for Summary Judgment (#11). Plaintiffs have not responded within the time allowed. Plaintiffs had from September 11, 2006, through October 30, 2006, some 49 days, to file their response. On October 24, 2006, the undersigned entered an Order denying plaintiffs' second Motion for Extension of such deadline, which sought more than 60 days within which to file a response. The undersigned found such proposed extension "unacceptable under the framework of the Pretrial Order" and that such an extension would "jeopardize the court's disposition of defendant's Motion for Summary Judgment" before the January 2007 trial term. Rather than foreclose any response (inasmuch as the original extension had run), the undersigned allowed plaintiffs up to October 30, 2006, to file their response. The docket indicates that an electronic notification of such Order was sent to two email accounts at plaintiffs' counsel's law firm on October 25, 2006. More than a week has now passed since such deadline ran and no response has been filed. The undersigned is compelled to recommend that the

relief sought by defendants be summarily granted for such procedural default and, alternatively, that such relief be granted based on the pleadings inasmuch as defendants are entitled to absolute prosecutorial immunity as a matter of well settled law in the Fourth Circuit.

## FINDINGS AND CONCLUSIONS

### I.    Background

This action was removed by defendants from the North Carolina General Court of Justice, Superior Court Division, McDowell County, on November 18, 2005. The action had been filed on October 14, 2005. The basis for such removal was federal question jurisdiction under 28, United States Code, Section 1331.

Plaintiffs' claim arise from investigations that resulted in custody orders based on the abuse of "S.," the son of plaintiff Yvonne Preston and the stepson of plaintiff Tom Preston. An additional custody order issued as a result of the living conditions of "G.," the natural child to both plaintiffs, who was born after the abuse began of S. It is undisputed that plaintiff Yvonne Preston voluntarily waived her parental rights as to S., who remains in foster care.

In December 2000, S., at the time five years old, suffered severe burns to his buttocks when he was forced to sit on a rag soaked with acetone by his maternal grandfather. The plaintiffs were then living with the maternal grandfather. The grandfather acknowledged that he had forced S. to sit on the acid-soaked rag, and attempted to justify his actions by claiming to plaintiff Yvonne Preston that he felt this conduct was necessary in order to teach S. a lesson about wetting the bed.

Yvonne Preston Depo., a 11-12. The chemical burns left noticeable and substantial scarring throughout the entirety of S.'s buttocks area.

Because Yvonne Preston had been seriously abused by her father as a child, she immediately suspected that he had caused the burns. Y. Preston Depo., at 59-60. For this reason, she attempted to keep S. from spending any time alone with her father from that point forward. Y. Preston Depo., at 60, 63. However, she and her husband continued to live with him, even after she learned she was pregnant. Y. Preston Depo., at 90.

From December 5, 2000 until January 21, 2001, S. was absent from school. Yvonne Preston told school officials that a spring had come through S.'s mattress, that he had wet the bed, and that the combination had caused a chemical burn to his buttocks. Later, Yvonne Preston told school officials that S. had gotten into a cleaning solution located under the sink which caused his chemical burns. Affidavit of Sheila Grindstaff, ¶11, Exhibit "A".

On December 12, 2001, a little over a year after suffering his chemical burns, S. was a first grader at an elementary school in McDowell County. When he arrived at school that morning, his teacher noticed slap marks on both sides of his face extending up toward the temple area, marks which he claimed were made by his stepfather, plaintiff Tom Preston. Affidavit of Sheila Grindstaff, Exhibit "A". The teacher made a referral to the McDowell County Department of Social Services, which began an immediate investigation and took S. to see Dr. Cynthia Brown, a board certified pediatrician with a special emphasis on child abuse and neglect. Dr.

Brown did a child medical evaluation of S., and interviewed him, as did other investigators in her presence. In the course of her medical evaluation, Dr. Brown performed a full physical, which revealed the acid burns, by now severe scars, on his buttocks area. Brown Depo., at 24-25. According to Dr. Brown, S.'s second-degree burns would have started as open wounds, and would have been very painful and prone to infection. Brown Depo., at 26. S. told Dr. Brown that his grandfather had forced him to sit on an acid-soaked towel and that his stepfather had been present and encouraged it. He also indicated his mother had been present. Brown Depo., at 24; Exhibit 1. Affidavit of Sheila Grindstaff, Exhibit "A". Dr. Brown also noticed the slap marks on S.'s face, which, in spite of plaintiff Yvonne Preston's assertions to the contrary, appeared to be marks left by an adult hand and inflicted no more than 2- 3 days prior to the evaluation. Brown Depo., at 22-23. During the course of the evaluation, S. described being struck in the face and stomach by his grandfather and his stepfather, described being forced to eat hot jalapeño peppers and horseradish, described furniture being thrown around the house by his stepfather, and recounted how his stepfather said he should have to wear a dress. Brown Depo., at 32-37. Affidavit of Sheila Grindstaff, Exhibit "A".

Dr. Brown determined that S. had been both physically and emotionally abused, and stated in her report, "I have grave concerns about this child's safety, health and emotional well-being in this environment." Brown Depo., at 38-39. As a result of Dr. Brown's findings, the McDowell County Department of Social Services filed an emergency petition for non-secure custody, which would effectively remove

S. from the home and place him in protective custody. The order for non-secure custody was entered by Judge Randy Pool, McDowell County District Court Judge, on December 12, 2001. Affidavit of Sheila Grindstaff, ¶11; Exhibit "A".

On December 18, 2001, a hearing was held in McDowell County District Court before Honorable Laura J. Bridges, District Court Judge. At the conclusion of that hearing, Judge Bridges entered an order finding that S. was "exposed to a substantial risk of physical injury or abuse because the parent, guardian, custodian or caretaker has created conditions likely to cause injury or abuse or has failed to provide or is unable to provide adequate supervision or protection." Judge Bridges extended the non-secure custody, and scheduled an additional hearing on January 4, 2002. The order on non-secure custody was continued by Judge Pool until January 24, 2002. On February 21, 2002 a hearing on the abuse and neglect petition took place in McDowell County District Court. After considering the evidence presented, Judge Pool entered an Adjudication and Dispositional Order in which he found that S. "was living in an environment injurious to his welfare and was a neglected and abused child." He also found that Yvonne Preston "allowed cruel and grossly inappropriate procedures to be used on the minor child in order to modify the child's behavior." Judge Pool determined that S. was an abused and neglected juvenile, ordered that he have no contact with his stepfather or grandfather, ordered him maintained in foster care, and limited his visits with Yvonne Preston to one hour per week. Affidavit of Sheila Grindstaff, ¶11; Exhibit "A".

On September 18, 2002, plaintiff Tom Preston and the grandfather were

charged with felony child abuse causing serious injury. These charges were based on allegations that S. made that his stepfather and grandfather had forced him to sit on the rag soaked with acetone, while his mother was present in the room.

Five days after the grandfather and plaintiff Tom Preston were charged with felony child abuse, social workers discovered that Plaintiff Yvonne Preston had given birth to another child. Affidavit of Betty McKesson, ¶12. Affidavit of Sheila Grindstaff, ¶13. Plaintiff Yvonne Preston had failed to notify DSS of the birth of her child and, despite her suspicions that her father had actually caused the harm to S., and despite the fact that her father and husband had both been charged with causing the injury to S., plaintiff lived in the home with her husband and father, and the new baby, G. Y. Preston Depo., at 90. Affidavit of Betty McKesson, ¶¶12-13; Exhibit "A". McDowell County Social Workers confronted Yvonne Preston and asked if she had, in fact, recently had a baby. She admitted that she had, and admitted that she was living with her father, although she claimed her husband had moved next door. Plaintiff Yvonne Preston was advised by DSS workers that she could not live in the home with her father or in the home with her husband and the young baby in light of the pending charges and allegations. Y. Preston Depo., at 92-93. Affidavit of Betty McKesson, ¶15. Plaintiff Yvonne Preston agreed to move, and eventually she and G. found lodging with a friend.

On September 27, 2002, Judge Randy Pool, again presiding in McDowell County Juvenile Court, entered a non-secure custody order with regard to G., thus requiring his removal from the home, on the grounds that he was exposed to a

dangerous environment. Affidavit of Betty McKesson, ¶15; Exhibit "A". On October 9, 2002, twelve days after the entry of the non-secure custody order, the order was dissolved, and it was determined that G. could be permitted to go back to live with plaintiff Yvonne Preston, although he and Yvonne Preston were to remain apart from the Plaintiff Tom Preston and the grandfather. Affidavit of Betty McKesson, ¶19; Exhibit "A".

On March 12, 2003, the District Attorney's office entered a voluntary dismissal as to the felony charges against Fred Gurule and Plaintiff Tom Preston. On June 9, 2003, a petition for termination of parental rights was filed in which plaintiff Yvonne Preston waived her parental rights relating to S. On September 19, 2003, Judge Pool entered a judgment and order terminating plaintiff Yvonne Preston's parental rights relating to S. Affidavit of Sheila Grindstaff ¶19; Exhibit "A". According to plaintiff Yvonne Preston, her decision to waive her parental rights was based solely on what she thought was best for him, which she believed to be his contained placement in foster care. Y. Preston Depo., at 85.

Plaintiffs subsequently filed this action claiming that they were treated inappropriately during the investigation and prosecution of the petitions for non-secure custody. Brought under 42, United States Code, Section 1983, plaintiffs contend that defendants' acts violated their 14th Amendment interest in privacy. Plaintiffs have also brought supplemental claims under state law for negligent supervision, malicious prosecution, intentional and negligent infliction of emotional distress, negligence, and civil conspiracy.

Defendants have now moved for summary judgment on the basis of absolute prosecutorial immunity. In the alternative, they seek summary judgment based on good faith immunity, on the substance of the claims, and the statute of limitations. For the reasons discussed below, defendants are entitled to absolute prosecutorial immunity and the alternative reasons for summary judgment need not be reached.

## II.     Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary

judgment." Id. at 248.  A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.  The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980).  Affidavits filed in support of a defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves.  United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971).  When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper.  Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255.  In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

**III.  Discussion**

**A.  Summary Judgment Based on Prosecutorial Immunity**

**1.  Nature of Prosecutorial Immunity**

A state prosecutor is a quasi-judicial officer who enjoys absolute immunity from suit when performing prosecutorial, as opposed to investigative or administrative, functions.  Imbler v. Pachtman, 424 U.S. 409 (1976).  Absolute immunity is designed to protect the judicial process. Id.  In determining whether such

immunity is available, courts consider whether the challenged actions of the prosecutor are closely associated with the judicial process.  <u>Burns v. Reed</u>, 500 U.S. 478 (1991).

### 2.    Prosecutorial Immunity Applies to Social Workers

The Court of Appeals for the Fourth Circuit has explicitly held that absolute prosecutorial immunity applies to social workers seeking custody orders.  In <u>Vosburg v. Dept. of Social Services</u>, 884 F.2d 133 (4th Cir. 1989), the appellate court considered an action brought by a mother on behalf of her daughter and herself against the Virginia State Department of Social Services and four social workers arising from the filing of a petition for removal of a child from her home. The district court granted summary judgment, reasoning that in filing a petition, the social workers were functioning as prosecutors, and that under the Supreme Court's decisions in <u>Imbler</u> <u>supra</u>, and <u>Butz v. Economou</u>, 438 U.S. 478, 98 (1978), such social workers were entitled to prosecutorial immunity. The Fourth Circuit agreed, stating:

> in filing the Removal Petition the social workers were acting in a prosecutorial, rather than in an 'investigative' or 'policing' capacity. Under *Imbler* and *Butz*, therefore, these state agents must be afforded absolute immunity from any liability arising from this conduct.  *Imbler* held that prosecutors are absolutely immune from §1983 actions for conduct occurring within the scope of their duties in initiating and pursuing a criminal prosecution… 'the public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages'… In *Butz* the Supreme Court extended absolute immunity to all federal officials whose 'special functions required a full exemption from liability'… *Butz* itself seemed to equate those 'special functions' with 'activities intimately associated with the judicial process' - i.e. activities that constitute the functional equivalent of those engaged in by

judges, advocates, and witnesses.

Id., at 135-36 (citations omitted). There is no substantive difference between the Virginia child removal statute underlying Vossberg and the North Carolina statutes permitting petitions for non-secure custody. N.C. Gen. Stat. §7B- 503 *et seq.*; c.f. Va. Code §16.1-252. Based on current case law, there is no question that in seeking non-secure custody orders in this case, defendants were engaged in activities intimately associated with the judicial process, acting in roles that were the functional equivalent of state prosecutors or attorneys advocating for the rights of children.

### 3. Decisions Since Vossberg

Since the Fourth Circuit issued its decision in Vossberg, the United States Supreme Court has weighed in on the issue of whether social workers are entitled to absolute prosecutorial immunity in Hoffman v. Harris, 511 U.S. 1060 (1994), albeit found in *dicta*. Despite the opinion being *dicta*, the undersigned has closely considered the dissenting opinion of Justice Scalia, which held, as follows:

> The courts that have accorded absolute immunity to social workers appear to have overlooked the necessary historical inquiry; none has seriously considered whether social workers enjoyed absolute immunity for their official duties in 1871. If they did not, absolute immunity is unavailable to social workers under § 1983. This all assumes, of course, that "social workers" (at least as we now understand the term) even existed in 1871. If that assumption is false, the argument for granting absolute immunity becomes (at least) more difficult to maintain.
>
> It may be argued that the Sixth Circuit and other courts have effectively identified a common-law counterpart to the modern social worker for purposes of the immunity analysis: the 1871 prosecutor. In reasoning that the social worker functions as a prosecutor in performing certain duties, these courts essentially have suggested that, by analogy, the historically rooted immunity for prosecutors should apply to social workers. In the absence of a detailed examination of the immunity (if

any) that applied to social workers in 1871, however, such an analogy must be suspect. But even putting historical concerns aside, it is not clear to me that the functional analysis of the Sixth Circuit is correct. I am not convinced that social workers, who often are involved in civil family welfare proceedings, can ever function as prosecutors for purposes of § 1983 immunity analysis.

Of course, the decision below and other decisions granting absolute immunity to social workers may be premised more on the notion that absolute immunity serves important policy concerns than on either historical or functional analyses. To the extent they are so based, they are misguided: The federal courts "do not have a license to establish immunities from § 1983 actions in the interests of what [they] judge to be sound public policy."

We should address the important threshold question whether social workers are, under any circumstances, entitled to absolute immunity. Accordingly, I respectfully dissent.

Id., 14 S.Ct. 1631, at 1632.

Justice Scalia poses the relevant inquiry in determining whether any immunity is available under Section 1983, which is whether the person asserting absolute immunity would have enjoyed that privilege in 1871 when Congress enacted the *Civil Rights Act of 1871*, the precursor to Section 1983. As the Supreme Court held in Quern v. Jordan, 440 U.S. 332 (1979), the legislative history of the 1871 Act provides absolutely no indication that the 42nd Congress intended to abrogate other immunities enjoyed by the States:

Given the importance of the States' traditional sovereign immunity, if in fact the Members of the 42d Congress believed that § 1 of the 1871 Act overrode that immunity, surely there would have been lengthy debate on this point and it would have been paraded out by the opponents of the Act along with the other evils that they thought would result from the Act. Instead, § 1 passed with only limited debate and not one Member of Congress mentioned the Eleventh Amendment or the direct financial consequences to the States of enacting § 1. We can only conclude that this silence on the matter is itself a significant indication of the legislative intent of § 1.

Id., at 343. Equally, there is no mention of prosecutorial or judicial immunities.

The undersigned respectfully believes that in considering immunity, it must be remembered that while the immunities may be fixed in time to those present in 1871 for Section 1983 purposes, the words used to describe the people involved in the judicial process have evolved. For example, in 1871 the state's prosecutor was a "solicitor," and is now a "district attorney." Many of the 1871 duties of judges are now performed by administrative law judges, magistrates, arbitrators, and members of professional licensing and disciplinary boards. Mazzucco v. North Carolina Bd. of Medical Examiners, 31 N.C.App. 47, 50 (N.C.App. 1976). Likewise, many of the 1871 duties of prosecutors are now performed by regulators and specialized public employs, such as social workers.

Further, in determining whether an immunity was applicable in 1871, it must be remembered that the words used describe such immunity are adjectives, i.e., *judicial* and *prosecutorial*, and not nouns, i.e., judge and prosecutor. This distinction is important for two reasons: (1) the immunities that developed at common law protect the integrity of the judicial process, not people; and (2) to narrowly read the immunities as applicable only to "judges" and "prosecutors" would be to erode the protection of the judicial process by exposing the judicial system to attack merely because duties were shifted to another person who happens to have a new title.

In this case, the pleadings now before the court do not address the historical context of the social worker in North Carolina, but instead rely on the clear decision of the Court of Appeals for the Fourth Circuit in Vossberg. The undersigned believes

that <u>Vossberg</u> provides the applicable rule of law, but has looked to the historical context of social work in an abundance of caution, as Justice Scalia suggests is the proper mode for analysis. The undersigned has little doubt that the title "social worker" was not in the lexicon of North Carolina in 1871, a year in which found such state in the midst of Civil War reconstruction and recovery. The reported cases of North Carolina first mention the term "social worker" in 1928. <u>State v. Hundley</u>, 195 N.C. 377, 42 S.E. 330, 334 (1928).

### 4.   Conclusion

While it is reasonable to conclude that there were no social workers in the state's employ in 1871, it is also reasonable to conclude that the state in 1871 had an interest in assuring the protection of children from abuse, and that such function was performed by state solicitors in and before 1871. <u>See</u> <u>State v. Watts</u>, 10 Ired. 369, 1849 WL 1410 (N.C. 1849)(criminal prosecution by a solicitor of a minister for conducting a marriage of a female child under age 15); <u>State v. Terry</u>, 1839 WL 516 (N.C. 1838)("Any person who shall ravish and carnally know any female of the age of ten years or more, by force or against her will, or who shall unlawfully and carnally know and abuse any female child under the age of ten years, shall be adjudged guilty of felony, and shall suffer death without benefit of clergy." <u>Id.</u>, at 1 (citation omitted)).

The published opinions of the State of North Carolina speak to a history of but one form of immunity, i.e., judicial immunity, and that prosecutorial immunity is derived from judicial immunity, holding, as follows:

Judges and judicial officers have always been awarded "absolute" immunity for their judicial acts. Absolute immunity covers even conduct which is corrupt, malicious or intended to do injury. Prosecutorial immunity is likewise absolute because it is really but a particular manifestation of judicial immunity.

State ex rel. Jacobs v. Sherard, 36 N.C.App. 60, 64 (N.C.App. 1978)(citations omitted). Thus, North Carolina has "always" extended absolute immunity for judicial acts. In reading the portions of the Complaint which are not barred by the passage of the three year statute of limitations applicable to Section 1983 actions, it is the judicial acts of the defendants of which plaintiffs complains, which is the petition of the court for non-secure custody orders for the protection of S. and G.

Without doubt, children and other persons unable to fend for themselves have been within the realm of persons protected by the state as discussed above. It follows then that the modern social worker's duties at issue in this suit are a subset of duties that were once performed by state prosecutors. Such reassignment of duties by the North Carolina Legislature did not remove the function from the judicial process, and it follows that the immunities which allowed state prosecutors to prosecute such matters without "the constant threat of civil suit and judicial proceedings" necessarily came with such delegation. Mazzucco, supra, at 50. Absent some affirmative renouncement of immunity by the state, the undersigned would be hesitant to find that social workers were stripped of such immunity.

The undersigned finds, therefore, that while the position of "social worker" was not in existence in 1871, both the duties and immunities at issue in this case were in existence when Section 1983 was enacted in 1871, and the legislative history of the

42nd Congress provides no indication that it wished to subject those who attempt to protect children through the judicial process to Section 1983 liability. To not extend prosecutorial immunity to social workers engaged child protection activities would surely chill their ability, as it would have a prosecutor or a judge in 1871, to seek protection through judicial process for children and others who can not protect themselves. The potential for being held personally liable under Section 1983 for any mistake of fact or law could prevent all but the most judgment-proof social workers from venturing outside the office.

> Judicial and prosecutorial immunity rests on the principle that if not so protected, our judicial and prosecutorial officers, even though honest and conscientious, would labor under the constant threat of civil suit and judicial proceedings would be seriously hindered.

Mazzucco, supra.

In any event, and regardless of the analysis suggested by the *dicta* in Hoffman, summary judgment is required based on prevailing and controlling case law found in Vossberg, which clearly finds that social workers operating under a similar statutory scheme are entitled to immunity from suit under Section 1983. The undersigned will therefore recommend that summary judgment be granted in favor of defendants on all claims based on prosecutorial immunity.

### B.    Good Faith or Qualified Immunity

As the appellate court found in Vossberg, absolute prosecutorial immunity could only extend to the prosecutorial acts of social workers, not the acts in furtherance of their investigations. Id., at 138. As discussed above, it would appear that the acts of investigation alleged in the Complaint predate the three year statute

of limitations applicable to both the Section 1983 claims and the supplemental state tort claims. To the extent that such claims are not time barred, it would appear that defendants are entitled to good faith or qualified immunity for such claims. Id. Furthermore, in the event absolute prosecutorial immunity is not found to be applicable, it would appear that good faith immunity also bars plaintiffs' claims for these defendants judicial or prosecutorial acts.

Good faith immunity in analyzed by applying the tenets of qualified immunity review. Myers v. Morris, 810 F. 2d 1437 (8th Cir. 1987); Robinson v. Via, 821 F. 2d 913 (2nd Cir. 1987); Ernst v. Child and Youth Services of Chester County, 108 F. 3d 486 (3rd Cir. 1997); Snell v. Tunnell, 920 F. 2d 673 (10th Cir. 1990); Austin v. Borel, 830 F. 2d 1356 (5th Cir. 1987).

Defendants are entitled to qualified immunity from plaintiffs' claims made against them in their individual capacities because objectively reasonable officers possessing identical information would have reasonably believed their conduct was lawful. Indeed, plaintiff Yvonne Preston admitted as much in her deposition. Even if these defendants purported conduct had violated a clearly established rule of law, which it did not, they would still be entitled to immunity if they reasonably believed that their conduct was lawful. Anderson v. Creighton, 483 U.S. 635, 638 (1987). See also Malley v. Briggs, 475 U.S. 335 (1986).

Public officials are free from liability for monetary damages if they can plead and prove that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v.

Fitzgerald, 457 U.S. 800, 815-16 (1982).   In Mitchell v. Forsyth, 472 U.S. 511 (1985), the Supreme Court held that qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id., at 526.   Qualified immunity is a question of law.   Adams v. St. Lucie County Sheriff's Department, 962 F.2d 1563, 1566-67 (11th Cir. 1992).

When a defendant moves for summary judgment on the ground of qualified immunity, the court "considers in the light most favorable to the plaintiff all facts fairly inferable from the record--regardless of the existence of factual disputes--and decides whether, under those facts, defendant's conduct violated law clearly established at the time." Bennett v. Parker, 898 F.2d 1530 n.2 (11th Cir. 1990).   A plaintiff must produce evidence sufficient to create a genuine issue as to whether a defendant committed the acts alleged.   In this case, plaintiffs have presented absolutely no evidence. As a matter of law, those acts must be sufficient to generate liability under the United States Constitution or substantive federal law. All inferences, including credibility of an affiant, are drawn in favor of a plaintiff for qualified-immunity purposes.   Gordon v. Kidd, 971 F.2d 1087, 1093-94 (4th Cir. 1992).

If it is undisputed that the right allegedly violated was clearly established at the time, the defendant asserting a qualified-immunity defense may still be immune from damages for violation of that right if, under the circumstances, a reasonable officer could have believed that his particular conduct was lawful.   A court must make an

objective, although fact-specific, inquiry into the legal reasonableness of the conduct. Anderson v. Creighton, supra, at 641. The lawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable officer charged with knowledge of established law; a defendant's motives are irrelevant to the qualified-immunity inquiry. Id.

When presented with a report of abuse, the duty of a Social Worker is clear in North Carolina. According to Chapter §7B-302 of the North Carolina General Statutes,

> when a report of abuse, neglect or dependency is received, the director of the department of social services shall make a prompt and thorough investigation in order to ascertain the facts of the case, the extent of the abuse or neglect, and the risk of harm to the juvenile, in order to determine whether protective services should be provided or the complaint filed as a petition.

N.C.Gen.Stat. § 7B-302. It is undisputed that the McDowell County Department of Social Services was contacted regarding S. when his teacher noticed large, red, welted slap marks with bruising on both sides of his face. Brown Depo., at 16. In the course of her initial examination, Dr. Brown determined that the marks on S.'s face were consistent with slap marks from an adult hand and were relatively recently inflicted. Brown Depo., at 22-23. Dr. Brown then conducted a physical examination of S., at which time she discovered the healed scars of what appeared to be severe burns on S.'s buttocks. Brown Depo., at 24. S. also described multiple incidents of abuse and revealed that this stepfather would come in his bedroom and kick his puzzles, and throw his dressers and described being forced to eat horseradish, hot peppers and jalapenos. Brown Depo., at 33. S. also said that his grandfather gave him

"whippings" on his bottom and said "now I know the different places I can whip you that would hurt." Brown Depo., at 34. When asked about the marks on his face, S. replied that his stepfather, "smacked me the night before last" and also described being punched in the stomach and thrown to the ground by his stepfather. Brown Depo., at 34. The only explanation S. gave regarding the scars on his buttocks was that he was forced to sit on a rag soaked with "some chemical." Brown Depo., at 38. When the examination was complete, the doctor determined that the hand print patterned injuries on his face and the scars on his bottom were findings consistent with physical abuse. Brown Depo., at 42). Her findings were consistent with S.'s statements of how the injuries occurred. (Brown depo. p. 45). Finally, in her report, Dr. Brown indicated that she had "grave concerns about [S.'s] health, safety, and emotional well-being in his home environment." She also was concerned that because S. had revealed how his injuries had occurred that he was at risk for being punished if allowed to go home. Brown Depo., at 39.

Based on this examination, the statutory-mandated investigation, and these findings, the McDowell County Department of Social Services filed an emergency petition for non-secure custody. Following a full hearing on the abuse and neglect petitions, a McDowell County District Court Judge not only adjudicated S. as abused and neglected, but also found that he was living in an abusive and injurious environment. Affidavit of Sheila Grindstaff ¶11; Exhibit "A".

After S. had been removed from the home pursuant to court order, the DSS became aware that plaintiff Yvonne Preston had given birth to another child and that

she was potentially living with her husband, plaintiff Tom Preston, and her father, both of whom had by this time been charged with felonious child abuse inflicting serious injury. Living with and around two individuals who had been implicated in the abuse of S. formed a reasonable basis to conclude that G., an infant, might be subjected to an unsafe and harmful environment. Indeed, as set forth above, Plaintiff Yvonne Preston even admits that it was reasonable to believe that G. might be in a dangerous environment in light of what had happened to S. The District Court again entered a non-secure custody order, especially in light of the substantial and documented abuse of S. Affidavit of Betty McKesson, ¶15; Exhibit "A". The non-secure custody order was in place for a period of 12 days, after which G. was returned to his mother. Such return was, however, conditioned on G. being kept away from plaintiff Tom Preston and the grandfather.

There simply is no evidence that the defendants acted in any manner other than in good faith and the best interests of what the children, who were clearly being exposed to physical and mental abuse in the home. All of the action of the defendants were taken with approval and authority of independent judicial officials, who found cause for removal of S. and G. from the home. The undersigned, therefore, must respectfully recommend that defendants' Motion for Summary Judgment based on qualified immunity be granted.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendants' Motion for Summary Judgment (#11) be **GRANTED,** and that judgment be entered in favor of defendants and against plaintiffs on all claims, dismissing the claims of the plaintiffs with prejudice.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: November 8, 2006

Dennis L. Howell
United States Magistrate Judge